# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 10-01484-TLM** |
| **RICHARD W. HOYLE,** | ) | |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION ON EXEMPTIONS
_____

**BACKGROUND AND PROCEDURAL POSTURE**

This matter came before the Court at hearing on June 19, 2013, and was taken under advisement following presentation of evidence and oral argument.

Over three years ago, on May 17, 2010, Richard Hoyle ("Debtor") filed a voluntary petition commencing a chapter 11 case.[1]  After 32 months during which Debtor acted as a debtor in possession ("DIP") and attempted to reorganize, the Court converted the case to chapter 7 on January 17, 2013 on the U.S. Trustee's motion.  *See In re Hoyle*, 2013 WL 210254 (Bankr. D. Idaho Jan. 17, 2013).  Janine Reynard was appointed as the chapter 7 trustee in the case ("Trustee").

Despite the requirements of Rule 1019(4) and § 521(a)(4), Debtor failed to

_____

[1]  Unless indicated otherwise, all statutory citations are to the Bankruptcy Code, Title 11, U.S. Code §§ 101–1539, and all citations to rules are to the Federal Rules of Bankruptcy Procedure.  The Court takes judicial notice of its files and records as necessary to explain the course of events, prior rulings, and similar matters affecting this Decision.  Fed. R. Evid. 201.

MEMORANDUM OF DECISION ON EXEMPTIONS - 1

immediately turn over all property of the estate to Trustee.  Trustee therefore on

February 13 filed a motion "for turnover"[2] of all DIP accounts and the funds

therein, calculated by Trustee to be $58,268.28 as of the conversion date.  Doc.

No. 394.  Trustee noted in her motion that Debtor resisted turnover of such

amounts based on his assertion that some unspecified portion thereof reflected

earnings from personal services, or that he was entitled to deduct a "management

fee" of some magnitude before surrendering the balance of the accounts.  On

February 15, Debtor in fact raised such an objection to Trustee's motion.  *See* Doc.

Nos. 402, 403.  On the same date, Debtor filed an amended schedule C.  Doc. No.

404.  In that filing, Debtor claimed the following exemption in the DIP accounts,

in the amount of $55,485.63:

> Postpetition earnings for property management services.  Authority is
> claimed under 11 USC 541, 348 and 1115.  See In re Evans, 464 BR
> 429 (Col., 2011).  ALTERNATIVE exemption claimed per I.C. 11-207.

*Id.* at 2.  Trustee timely objected to the exemption.  *See* Doc. No. 431.[3]

---

[2]  Both here and in connection with a later amended motion discussed below, Trustee
urged "turnover" under § 521(a)(4) which requires a debtor to "surrender" to the chapter 7 trustee
all property of the estate in his possession.

[3]  Debtor also claimed certain additional exemptions through amended schedules filed
March 4, 2013.  *See* Doc. No. 440.  The first was in a "Charles Schwab Bank—retirement
account" in the amount of $1,684.00, claimed by Debtor as fully exempt under Idaho Code
§ 11-604A.  The second was an exemption of "household goods and furnishings" in the amount
of $7,500.00 under Idaho Code § 11-605(1)(a), (b) or (c).  *Id.* at 9.  Trustee timely objected to
these claimed exemptions as well.  *See* Doc. No. 482 at 3–4.  In prehearing briefing, Debtor
conceded that the Schwab Account was not and had not been a "retirement account" and that such
exemption would not be pursued (though an alternative exemption might be made), and that the
                                                                    (continued...)

MEMORANDUM OF DECISION ON EXEMPTIONS - 2

On February 19, the Court ordered that all the money held or subsequently

collected by Debtor was to be immediately surrendered and turned over to Trustee,

and that any issues as to the characterization of those funds, and any adjudication

of Debtor's alleged interests therein (whether through exemption or otherwise),

would be heard at a later date.  Doc. No. 411 (minute entry).[4]  In so ordering, the

Court observed that Debtor was required by the Code to surrender, and Trustee

entitled to recover and hold, all such funds.  *See* § 521(a)(4); Rule 1019(4).  It

noted that Trustee would hold the same as a fiduciary, thus protecting Debtor's

right to any amounts that might be determined by final order to be exempt.  The

Court was not at that time advised that Debtor had been and was continuing to

write checks on the DIP accounts post-conversion.

At a hearing on March 18, the parties agreed that the exemption issues

would be heard on May 15.  Doc. No. 465 (minute entry).  On May 13, the Court

continued that exemption hearing to June 19, on Debtor's request, to allow him

additional time to consult with an accountant.  *See* Doc. Nos. 523, and 541 (minute

entry).

---

[3](...continued)
household goods exemption was improperly claimed due to lack of specificity required under
LBR 4003.1 (though also suggesting an amended exemption might be filed).  *See* Doc. No. 580 at
1–2.  No amendments were made prior to the June 19 hearing, and Trustee's objections to the
extant exemptions were therefore sustained at that hearing without prejudice to a filing of
amended claims of exemption.

[4]  Trustee was to provide a form of order on this ruling.  *Id.*  She failed to do so.

MEMORANDUM OF DECISION ON EXEMPTIONS - 3

On April 19, Trustee filed an "amended" motion for turnover of the DIP account balances, noting additional post-conversion collections of rental income from property of the estate of $21,855.28 which, together with the $58,531.46 in the accounts at conversion, should have resulted in Debtor delivering to her $80,386.74 under Rule 1019(4).  Doc. No. 511.  Debtor had delivered only $59,190.92, leaving $21,195.82 outstanding.  *Id.*  Through the motion, the Court learned for the first time that Debtor had made unauthorized post-conversion payments to third parties in violation of Rule 1019(4).  These improper payments, totaling $21,086.84,[5] effectively exhausted these other funds.  *Id.* at 4–6.  Though improperly paid out by Debtor, Trustee noted that she would have paid certain of these expenses required for preservation of assets of the estate.  She therefore waived objection as to $3,245.62, but sought to recover $17,841.22.  *Id.* at 7.

On May 29, the Court orally ruled that Trustee's amended motion for turnover was granted.  Doc. No. 556 (minute entry).[6]

The June 19 hearing did not address the turnover issues but, instead, involved the exemptions asserted by Debtor in the $59,190.92 that came from the DIP accounts and was delivered by Debtor, and Trustee's objections to those

---

[5]  At hearing on May 15, Trustee admitted that the small difference of $108.98 between the two figures (the $21,195.82 calculated from account statements as not delivered, and the $21,086.84 identified as paid to third parties) could not be fully explained on the information supplied by Debtor.  She made her turnover assertions only on the lower figure.

[6]  Once again Trustee was to provide an order on this turnover ruling, and failed to do so.

MEMORANDUM OF DECISION ON EXEMPTIONS - 4

exemptions, Doc. Nos. 431 and 482. For the reasons set out herein, the Court

sustains Trustee's objections, and denies the exemptions.[7]

**FACTS**

The matters before the Court concern the funds that were deposited into

(and withdrawn from) Debtor's DIP accounts. There is, however, another account

that has been addressed by the parties through testimony and in their exhibits—a

"Charles Schwab Bank—retirement" account (the "Schwab Account"). Debtor

argued that his discussion of payments made from the Schwab Account to his

LLCs or otherwise was meant to dispel an argument he felt Trustee was making to

the effect that Debtor's "personal" income was drawn from this Account. This

presumed debate and the Schwab Account are only indirectly material to the issues

presented for decision. For thoroughness, they will be briefly discussed.

    **A.**    **The Schwab Account**

When Debtor first filed the chapter 11 case, he claimed on schedule B at

item 12 (requiring disclosure of "Interests in IRA, ERISA, Keogh, or other pension

or profit sharing plans"), a "Charles Schwab Bank—retirement" account with a

balance of $204,500.00. Doc. No. 21 at 6.

In the post-conversion amendments to schedules on March 4, Doc. No. 440,

---

[7] This Decision constitutes the Court's findings of fact and conclusions of law as
required by Rules 7052 and 9014.

MEMORANDUM OF DECISION ON EXEMPTIONS - 5

this "Charles Schwab Bank—retirement account" is still listed on schedule B(12) and C but with a value of $1,684.00 rather than $204,500.00, apparently acknowledging withdrawals from the "retirement account" throughout the chapter 11 case and a new balance of that account at conversion. *See* LBR 1019.1(d)(5) (requiring amended schedules reflecting status of assets and liabilities as of conversion unless otherwise clearly disclosed in the required final report and account).[8]

As noted above, Trustee objected to this exemption, contending the Schwab Account was not a retirement account at all within the contemplation of the Idaho Code exemption, a position later conceded by Debtor in briefing, and the objection was thus sustained. *See* note 3, *supra*.

Still, the Schwab Account was discussed at some length at hearing. Both Trustee and Debtor introduced a May 2010 account statement, *see* Exs. 108 and 341, and Trustee introduced a January 2013 account statement, Ex. 342. Debtor subsequently introduced a massive exhibit, Ex. 110, containing several monthly

---

[8] Rule 1019(5)(A) requires a schedule of unpaid debts to be filed within 14 days of the conversion (here January 31), and a final report and account to be filed within 30 days of conversion (February 18). LBR 1019.1(d) describes what should be included in the final report and account. Debtor did not comply with those rules. Debtor did timely file the first amended schedule C, as required under LBR 1019.1(d)(5), on February 15, Doc. No. 404, but the remaining requirements of LBR 1019.1(d) were not met. Two weeks later a monthly operating report for January 2013 was filed. On March 4, Debtor filed a "status report" under LBR 1019.1, Doc. No. 439, and the further amended schedules, Doc. No. 440.

MEMORANDUM OF DECISION ON EXEMPTIONS - 6

account statements and copies of checks written on the Schwab Account.[9]

Though Debtor's amended schedules asserted a $1,684.00 balance of the Schwab Account at the January 17, 2013, conversion to chapter 7, Ex. 342 indicates an $893.56 value on January 1, 2013, and the same balance at the end of that month. Either way, it is clear a substantial amount was expended during the chapter 11.

Debtor testified that the Schwab Account, despite its scheduling as a "retirement account," was "kind of used as a savings account" throughout the case. He indicated that funds would be taken from the Schwab Account and put into his DIP accounts; or were used to pay obligations owed by Villa Verona, LLC, one of his closely-held limited liability companies; or went into a separate account for Debtor's other closely-held limited liability company, Brundage Inn, LLC. Debtor conceded in his examination that there had never been any reporting of any of the transactions concerning the Schwab Account in the monthly operating reports ("MOR") that he reviewed, signed and filed in the chapter 11. Debtor said he created the Schwab Account some ten years ago, well before the chapter 11, and

---

[9]  The exhibit is facially incomplete, containing monthly statements only for January 2010 through May 2010. (The account was still open in January 2013. *See* Ex. 342.) The exhibit does contain numerous checks, but they span a period from February 19, 2010 to only November 30, 2011. Those checks, incidentally, show $168,106.03 written to Brundage Inn, and $97,984.47 written to other parties and entities. This totals $266,090.50, which is more than the balance of the account at filing. Additionally, the account statements reveal several suspect transactions, including a debit to "Bronco Athletic" in the amount of $10,304.00.

MEMORANDUM OF DECISION ON EXEMPTIONS - 7

could not recall the sources of its funding other than believing "income" from the

sale of real property was deposited, and that he would occasionally transfer funds

into it from his other business accounts when their balances were high.

The change in value of the Schwab Account over the duration of the chapter

11 case that is suggested by Debtor's sworn schedules is $202,816.00.[10]  The May

2010 account statement, however, shows a starting balance of the account on May

1, 2010, of $173,321.92.[11]  *See* Ex. 341 at 3.  This therefore suggests an unreported

withdrawal of $171,637.92.[12]

There is a "note" in Debtor's amended schedules B(12) and C, stating:

"Micron stock originated from this account and is asserted was from exempt

proceeds."  Doc. No. 440 at 6, 9.  This is an apparent reference to the fact,

discussed in the Court's decision converting the case to chapter 7, that Debtor

failed to disclose on schedule B that he owned 5,000 shares of Micron

---

[10]  $204,500.00 less $1,684.00, equals $202,816.00.  This figure does not include, of course, any additions to the Schwab Account that may have occurred from May 2010 through January 2013.  But given the balance at conversion, any such additions would have been also depleted.

[11]  Debtor's prehearing brief similarly asserted that the account balance in May 2010 was $173,321.92, reflecting his and his counsel's access to the statement at that time.  *See* Doc. No. 580 at 2.  Recall, Debtor also in this brief conceded that the account is not a "retirement account" and is not entitled to exemption protection under Idaho Code § 11-604A.  However, he indicated that he believed he could "trace" the funds that went into the account to his "personal earnings" and suggested that he would amend his exemptions to assert that 75% of the account ($129,991.44) is exempt under Idaho Code § 11-207.  *Id.*  No such amendments have been filed.

[12]  $173,321.92 less $1,684.00, equals $171,637.92.

MEMORANDUM OF DECISION ON EXEMPTIONS - 8

Technology, Inc. stock at the time he filed his petition, having purchased the same

for $55,459.00 only one month before filing, and sold the same without Code

authorization or Court approval (or reporting or other disclosure) three months

after filing for $34,540.00.  *See Hoyle*, 2013 WL 210254 at *2.  At no time during

the litigation leading to the Court's decision to convert the case did Debtor ever

assert that the Micron stock was part of an "exempt" retirement account.

This is but the tip of a new iceberg.[13]  However a full "accounting" of the

Schwab Account is not required to address the issues presently under advisement.

### B.    Transactions involving the DIP accounts

Debtor personally owned numerous parcels of real property including single

family dwellings, apartments in a complex in Ontario, Oregon, a Boise

condominium, and cabins in McCall, Idaho.  At hearing, Trustee established that

the deposits to the DIP accounts over the duration of the chapter 11 case totaled

$553,932.17.  Of this amount, $553,680.27 represented real property rental

---

[13]  Recall, Debtor's chapter 11 case was converted because, among other things, he abjectly failed to adhere to financial reporting requirements and mismanaged the estate. The failure to report any of the Schwab Account activity (whether misidentified as a retirement account or not) adds to such problems.  The full extent of the ramifications of Debtor's activities in and with this Account cannot yet be ascertained.  The Court can note in passing, however, that Trustee has filed an adversary proceeding, Adv. No. 13-06015-TLM, against Charles Schwab & Co., Inc. ("Schwab").  In it, Trustee alleges that the account was not a retirement account but simply an investment or brokerage account that held *inter alia* 500 shares of the Las Vegas Sands Corporation and 1,000 shares of Citigroup, Inc. and that Schwab, on Debtor's behalf, sold the Citigroup stock on June 8, 2011 (three weeks after filing) for $34,350.33 and the Las Vegas Sands stock on November 29, 2011, (five months after filing) for $21,931.13.  (Unlike the Micron stock sale, these other two sales did not come to light prior to the conversion ruling.)

MEMORANDUM OF DECISION ON EXEMPTIONS - 9

income.[14]  Over the 32 months of the chapter 11, this rental income averaged $17,302.51 per month.

An analysis and breakdown of the MORs filed by Debtor in the case establishes that numerous "personal" expenses of Debtor were paid from the DIP accounts.  These personal expenses include mortgage, utility, insurance, upkeep, and real property tax payments on Debtor's residence; food, grocery and restaurant charges; insurance and other expenses on the automobile of Debtor's non-debtor spouse; medical expenses; and miscellaneous expenses categorized by Debtor in his MORs as "personal living expenses."  At hearing and following extended examination of Debtor, counsel for Trustee and Debtor stipulated on the record that these personal expenses averaged $3,077.00 per month throughout the duration of the chapter 11 case.[15]

---

[14]  The other $251.90 represents some interest earned and a small tax refund.

[15]  As discussed below, the magnitude of "personal" expenses paid Debtor out of the DIP accounts during the chapter 11 impacts the question of what Debtor believes he should be entitled to "exempt" as unpaid personal services income from the DIP accounts at conversion.  Thus, it is also relevant to consider other possible "personal" expenses paid.  For example, a number of the checks written on the Schwab Account appear to be personal in nature.  And recall that Debtor continued to make payments out of the DIP accounts post-conversion.  In Trustee's amended turnover motion, Doc. No. 511, these payments are itemized. *Id.* at 5–6.  They include two mortgage payments on Debtor's residence ($1,716.99 each); HOA fees on the residence ($225.00); lease of Debtor's apartment ($500.00); electricity for the residence ($168.45); city services for the residence ($24.46); cable ($284.95); dental care ($579.00); hair cut ($15.00); car insurance ($141.08) (from testimony the amount of Debtor's spouse's car insurance); a gym fee ($25.50); and groceries (several entries for Albertsons, Paul's Market, and Walgreens totaling $206.10).  This totals another $5,603.52, and excludes fuel charges and some other charges that can't easily be identified as business-related or personal, as well as an $11,000 payment to Debtor's counsel.

MEMORANDUM OF DECISION ON EXEMPTIONS - 10

Debtor does not concede that this effective monthly amount of $3,077.00 he drew from the gross real estate rental income caps the "compensation" to which he is entitled.  His arguments are not predicated on what he actually paid himself or applied to his personal benefit throughout the case.  Rather, he contends that a "wage" or "salary" or "compensation" for his services to the estate as a "property manager" should be determined by reference to the marketplace, and such amounts, to the extent they were not actually paid, should be determined to be either not property of the estate or, if property of the estate, subject to exemption. To establish these benchmarks, Debtor approached the issue two ways.[16]

First, Debtor submitted testimony that property managers in the McCall, Idaho area would charge for their services on a percentage-of-gross-rentals basis, and that the rate would vary from 20% to 30%.  The testimony established that rates on a similar basis in Boise, Idaho would be 10% to 15%.  Property managers on such a structure would be expected to cover their own "overhead" charges,

---

[16]   Debtor's prehearing brief contended that one of two sums should be deemed to be Debtor's "personal services" income.  One is $54,609.00, a figure representing a fee of 10% calculated on total real property rentals over the life of the chapter 11 case of $546,089.00.  (This would equate to $1,706.53 per month for the 32 months of the chapter 11 case.)  The other is $46,800.00 "per year" (effectively $3,900.00 per month) based on extrapolation of state labor statistics.  *See* Doc. No. 580 (brief) at 3.  Neither of these suggestions, however, addressed or accounted for the "personal" expenses paid to or drawn by Debtor throughout the life of the chapter 11 (a minimum, as established at hearing, of $3,077.00 per month.)  Debtor's actual assertions morphed as evidence was presented, and are discussed in the text.

MEMORANDUM OF DECISION ON EXEMPTIONS - 11

including employees.[17]  They would separately bill the property owner, in addition

to the commission, specific expenses incurred, such as extraordinary repair costs.

Debtor thus effectively submitted that, on a 20% commission basis calculated on

$553,680.27 of gross rental income, the compensation that he should be credited

with or allowed would be $110,736.05 over the 32 months of the chapter 11, or

$3,460.50 per month.[18]

Second and alternatively, Debtor argues that his compensation should be

benchmarked to a statistical figure generated by a report of the Idaho Department

of Labor.  A 2012 "Idaho Occupational Employment & Wage" report for Boise-

Nampa MSA (Ada, Boise, Canyon, Gem and Owyhee Counties) contains an

occupational entry for "property, real estate, and community association

managers" and reports an average (mean) hourly wage of $22.51.  Ex. 109.  Debtor

posits that such a wage generates an attributable income of approximately

---

[17] Debtor never deducted from his asserted commission amounts that would ordinarily be
included as a property manager's overhead under this model, including wages paid to employees.

[18]  Some clarification of the $3,460.50 amount is in order.  Debtor's and Trustee's
arguments and counter-arguments focused for the most part on commissions (here 20%)
calculated on the monthly average of gross rental income of $17,302.51.  Both parties also
discussed similar calculations at 10% (*i.e.*, $1,731.04 monthly), and 15% ($2,595.38), and even
30% ($5,190.75).  This was not only because they disagreed on the nature of the testimony, but
also in apparent recognition that not all of Debtor's properties were in McCall where the higher
rates were found.  The nature of the Court's ultimate decision, *infra*, limits the need to explore the
math in greater detail.

MEMORANDUM OF DECISION ON EXEMPTIONS - 12

$3,900.00 per month.[19]

Both approaches were methods to establish what a property manager might expect to be paid in southwestern Idaho.  But these scenarios of the hypothetical property manager had multiple variations.  Testimony indicated that fee arrangements for real property managers was subject to negotiation, and consequently quite variable.  Not only would the percentage commission rates be negotiable, but different property managers might charge for certain expenses while others would include them within their base compensation structure.

More importantly, neither approach reflects what Debtor actually did insofar as his compensation was concerned.  Throughout the duration of the chapter 11 case, Debtor was never paid, nor calculated his pay, based on a salary, an hourly wage or a percentage commission.  Rather, Debtor withdrew funds from DIP accounts (and, it now appears, the Schwab Account), and applied them without accounting rigor to payment of both "business" and "personal" expenses.[20]

---

[19]  Numbers used by counsel and witnesses in examination, and counsel in argument, varied, as did the evident methodology of calculation.  However: $22.51 per hour x 40 hours/week x 4.35 weeks/month = $3,916.74.  Debtor testified that he worked at least 40 hours a week managing the rental properties he personally owned.  The Court doubts the accuracy of that statement given the evidence presented at the June 19 hearing and throughout this case.  But the Court need not make a finding on that question because even assuming that fact were proven, the Court refuses to accept Debtor's argument on other grounds.  *See infra.*

[20]  The business expenses not only related to the real property that Debtor held in his own name but also to the two closely held LLCs, the finances and operations of which were commingled and never adequately reported under Rule 2015.3.  *See Hoyle*, 2013 WL 210254 at *3–4, 10–11.

MEMORANDUM OF DECISION ON EXEMPTIONS - 13

At end, Debtor elected not to make a stand on any one of the variations, but to instead present them all to the Court, apparently believing the Court could simply pick one from among them. Trustee argues that Debtor failed to establish any right to further compensation, by exemption or otherwise.

## DISCUSSION AND DISPOSITION

The heart of the dispute is Debtor's claim that the amounts in the DIP accounts at the time of conversion ($48,637.15 per amended schedule B2, Doc. No. 440 at 5)[21] represent or should be deemed to represent earnings from his personal services. He therefore asserts these funds are not property of the estate or "alternatively" are 75% exempt under Idaho Code § 11-207.

### A.    Property of the estate

The first question is whether the amounts in the accounts are property of the estate at all. If they are not, there is no need to address the question of exemption.[22] Debtor's argument proceeds in the following fashion. First, the

---

[21] As Trustee's amended motion for turnover and discussion at the May 29 hearing clarified, the actual amount in the DIP accounts at that time was $58,531.46. *See* Doc. No. 511 at 3.

[22] Determining an interest in property generally requires an adversary proceeding. *See* Rule 7001(2). However, both parties were represented by sophisticated counsel and effectively waived the right to insist on greater formality, neither "express[ing] any discontent" with the procedures. Indeed, the matter was continued to the June 19 hearing date to allow the parties additionally time to prepare to try it. And, as to the material aspects of this discrete dispute, the Court is "satisfied that neither the factual record nor the quality of the arguments would have been materially different had there been an adversary proceeding." *Jahr v. Frank (In re Jahr)*, 2012 WL 3205417, *5 (9th Cir. BAP Aug. 1, 2012) (citations omitted) (internal quotation marks
(continued...)

MEMORANDUM OF DECISION ON EXEMPTIONS - 14

amounts in the DIP accounts represent funds that were added to the estate (as it existed on the date of the chapter 11 filing) by reason of § 541(a)(6) and § 1115.[23] Second, at conversion, under Debtor's view of § 348, the property of the estate consists only of property that existed on the petition date, May 17, 2010, which remains in existence.  In his view, the post-petition additions—in their entirety—are outside property of the estate.  Thus, he contends that none of the funds remaining in the DIP accounts at the January 17, 2013 conversion are property of the estate.

This result generally attends a chapter 13 case that is converted to chapter 7. *See* § 348(f)(1).[24]  Thus, because § 1306(a)(2) includes as property of the estate the chapter 13 debtor's earnings from services performed post-petition, § 348(f)(1) excepts any such earnings, to the extent they still exist at conversion, from

_____

[22] (...continued)
omitted).

[23]  Under § 541(a)(6), property of the estate includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, *except such as are earnings from services performed by an individual debtor after the commencement of the case*." (emphasis added). However, § 1115 eliminates the earnings exception of § 541(a)(6) in individual chapter 11 debtor cases by capturing personal earnings of the debtor acquired while the chapter 11 case was pending as property of the estate.  *See* § 1115(a)(2).

[24]  In material part, this section provides: "[W]hen a case under chapter 13 of this title is converted to a case under another chapter of this title – (A) property of the estate in the converted case shall consist of property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the date of conversion[.]"  While this section by its terms operates when the chapter 13 case is converted to a case under any other chapter, issues commonly arise when the subsequent case is a chapter 7 liquidation, and the Court so casts the question in the balance of its discussion.

MEMORANDUM OF DECISION ON EXEMPTIONS - 15

property of the estate in the converted case.[25]

Debtor views § 1115 as establishing a functional corollary to § 1306 in individual chapter 11 debtor cases. Debtor concedes that § 348(f) specifically addresses the issue when chapter 13 cases are converted to chapter 7, but that no provision similar to § 348(f) exists in connection with converted chapter 11 cases (individual or otherwise). Yet Debtor argues that a construction of § 348 as a whole coupled with considerations of legislative history and legislative intent supports the same result when individual chapter 11 cases are converted to chapter 7. Debtor relies on the decision in *In re Evans*, 464 B.R. 429 (Bankr. D. Colo. 2011) to support his reasoning and result.

Trustee disagrees, and posits that the presence of § 348(f)(1) as to converted chapter 13 cases, and omission of a similar provision for converted individual chapter 11 cases, requires a different result. She relies on *Pergament v. Pagano (In re Tolkin)*, 2011 WL 1302191 (Bankr. E.D.N.Y. April 5, 2011), *aff'd* 2012 WL 1828854 (E.D. N.Y. May 16, 2012).

While the Court respects the thoughtful analysis of both these sister courts, Ninth Circuit decisional law is clear that the commands of *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004) must be followed. *See, e.g., Meruelo Maddux Properties–760 S. Hill Street, LLC v. Bank of America, N.A. (In re Meruelo*

---

[25] Section 348(f)(2) creates an exception to this rule for conversions made by a debtor in bad faith, but is of course irrelevant here.

MEMORANDUM OF DECISION ON EXEMPTIONS - 16

*Maddux Properties, Inc.)*, 667 F.3d 1072, 1076 (9th Cir. 2012) ("Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms, for courts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citation omitted) (internal quotation marks omitted), and at 1077 ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. 'It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.'") (quoting *Lamie*, 540 U.S. at 542) (citation omitted). *See also Hopkins v. Cerchione (In re Cerchione)*, 414 B.R. 540, 546 (9th Cir. BAP 2009) (noting, in addition, that "the starting point for discerning congressional intent is the existing statutory text, . . . and not the predecessor statutes.") (citations omitted) (internal quotation marks omitted). This Court has heeded that instruction. *See*, *e.g.*, *In re Wages*, 479 B.R. 575, 579, 582–83 (Bankr. D. Idaho 2012); *In re Marek*, 2012 WL 2153648 at *8 (Bankr. D. Idaho June 13, 2012) (citing *Hall v. United States*, __ U.S. __, 132 S.Ct. 1882 (2012) in addition to *Lamie*).

Congress did not choose, when adding § 1115 in 2005, to also amend § 348 to provide a provision like § 348(f)(1) for chapter 11 cases converted to chapter 7. As *Tolkin* summarizes:

> The language of [§ 1115] parallels the language of § 1306, and accomplishes the same goal of broadening the scope of property of the debtor's estate significantly beyond the parameters of § 541. However,

MEMORANDUM OF DECISION ON EXEMPTIONS - 17

unlike in a Chapter 13 case, there is no provision similar to § 348(f) to modify the result upon conversion of a Chapter 11 case to another chapter. *In re Quillen*, 408 B.R. 601, 620 n. 33 [Bankr. D. Md. 2009)] (". . . Section 1115 . . . is identical to Section 1306. Curiously though, no counterpart to Section 348(f) was codified in BAPCPA to correspondingly adjust the reach of Section 1115.") Therefore, what is captured as property of the debtor's estate under § 1115 remains as property of the estate, even after the conversion of the case to another chapter.

2012 WL 1302191 at *10.

The Court concludes that, in light of the omission of a provision equivalent to § 348(f)(1) applicable to the converted chapter 11 case, Debtor's arguments that the DIP accounts at conversion are not "property of the estate" does not hold. The Court turns to the alternative contention that the accounts, though property of the estate, are nevertheless exempt to the extent of 75% of their value under Idaho Code § 11-207.

### 2.    Idaho Code § 11-207 exemption

Fundamentally, a debtor may exempt certain types of property from the estate, but an Idaho debtor is limited to the exemptions provided under Idaho law. *See* § 522(b)(2); Idaho Code § 11-609. In Idaho, exemptions are liberally construed in favor of the debtor, though statutory language may not be tortured in the guise of liberal construction. *See*, *e.g.*, *In re Moore*, 349 B.R. 44, 46 (Bankr. D. Idaho 2005) (citations omitted). The objecting party (here, Trustee) bears the burden of proving the claim of exemption is not proper. *Id.* (citing Rule 4003(c)). Once that party presents "sufficient evidence to rebut the prima facie validity of

MEMORANDUM OF DECISION ON EXEMPTIONS - 18

the exemption, the burden shifts to a debtor to demonstrate that the exemption is

proper." *In re Preuit*, 2013 WL 2467976 at *8 (Bankr. D. Idaho June 7, 2013)

(citations omitted) (internal quotation marks omitted).

The exemption asserted by Debtor is found in Idaho Code § 11-207, which

provides:

> **Restriction on garnishment – Maximum.–**
> (1) Except as provided in subsection (2) of this section, the
> maximum amount of the aggregate disposable earnings of an individual
> for any work week which is subjected to garnishment shall not exceed
> (a) twenty-five per cent (25%) of his disposable earnings for that week,
> or (b) the amount by which his disposable earnings for that week
> exceed thirty (30) times the federal minimum hourly wage prescribed
> by 29 U.S.C.A. 206(a)(1) in effect at the time the earnings are payable,
> whichever is less. In the case of earnings for any pay period other than
> a week, the Idaho commissioner of labor shall by regulation prescribe
> a multiple of the federal minimum hourly wage equivalent in effect to
> that set forth in (b) of this subsection.

Idaho Code § 11-207(1). Statutory definitions, including that for earnings, are

provided in Idaho Code § 11-206:

> 1. "Earnings" means compensation paid or payable for personal
> services, whether denominated as wages, salary, commission, bonus, or
> otherwise, and includes periodic payments pursuant to a pension or
> retirement program.
> 2. "Disposable earnings" means that part of the earnings of any
> individual remaining after the deduction from those earnings of any
> amounts required by law to be withheld.
> 3. "Garnishment" means any legal or equitable procedure
> through which the earnings of any individual are required to be
> withheld for payment of any debt.

Idaho Code § 11-206.

Debtor's argument is necessarily grounded on a finding that the funds in the

MEMORANDUM OF DECISION ON EXEMPTIONS - 19

DIP accounts represent his "earnings" as defined in Idaho Code § 11-206, i.e.,

"compensation paid or payable for personal services, whether denominated as

wages, salary, commission, bonus, or otherwise[.]"  But the evidence is that *all* the

money in the DIP accounts at conversion, and indeed the $553,680.27 accumulated

in such accounts over the life of the chapter 11, were real property rents.

    This Court has had occasion to consider chapter 11 debtors' arguments that

amounts generated during reorganization are "earnings" within Idaho Code

§ 11-206 even though characterized as "accounts receivable" or some other term

which does not appear in the statute.  *See*, *e.g.*, *In re Marples*, 266 B.R. 202

(Bankr. D. Idaho 2001); *In re Atkinson*, 258 B.R. 769 (Bankr. D. Idaho 2001); *In

re DeBoer*, 1999 WL 33486710, 99.3 I.B.C.R. 101 (Bankr. D. Idaho July 20,

1999); *In re Grewal*, 1996 WL 34449125, 96.4 I.B.C.R. 146 (Bankr. D. Idaho

Nov. 7, 1996).

> Each of these cases arrives at a construction of the statute that gives
> effect to the exemption if factually it can be shown that the subject
> funds are generated by, and reflect compensation for, the "personal
> services" of the debtor, regardless of the nomenclature used to identify
> or characterize those funds. . . . Such an approach, this Court has
> determined, liberally and appropriately construes the plain language of
> the provision in order to protect a debtor's fresh start, while at the same
> time not torturing that language in order to provide a benefit not within
> the contemplation of the legislature.

*Marples*, 266 B.R. at 205 (citations omitted).  "[T]he focus should be 'on the

manner by which the amount owed the debtor was generated, rather than the words

used to characterize that obligation.'"  *Atkinson*, 258 B.R. at 774 (quoting *DeBoer*,

MEMORANDUM OF DECISION ON EXEMPTIONS - 20

1999 WL 33486710 at *6, 99.3 I.B.C.R. at 104). "The matter is, in the final

analysis, one of proof of the facts surrounding the creation of the account

receivable and to what extent the account receivable does or does not reflect

compensation for personal services of the debtor." *DeBoer*, 1999 WL 33486710 at

*5, 99.3 I.B.C.R. at 104.

Debtor did not segregate any alleged compensation from any other amounts

used in the operations of his businesses over the almost 3 years of the chapter 11.

All amounts were commingled. And the proof establishes all funds placed into the

DIP accounts are traceable to gross real estate rental proceeds. That Debtor was

entitled to a set amount of compensation or "earnings" (whether connoted as wage,

salary, commission, account receivable, or otherwise) was never a proposition

advanced in the case. Debtor simply took what he chose to take to pay personal

expenses. Some was later reported, though in an untimely and incomplete way, in

the MORs; other draws and uses were not reported and are still coming to light.

Ultimately, Debtor seeks to create, *post facto*, a compensation approach or

mechanism that was not in fact used during the case.

Debtor's two alternative constructs—the "commission" approach and the

"mean hourly wage" approach—are both hypothetical. They do not relate or

correlate to what Debtor in fact did over the 32 months of the chapter 11. He

never attributed a commission to the real property rentals, segregating that amount

from the gross rental income and accounting for it as personal income, nor did he

MEMORANDUM OF DECISION ON EXEMPTIONS - 21

compensate himself from the gross rental income on an hourly, monthly or other wage basis. Abstract arguments as to what might have occurred are no substitute for what in fact occurred. As stated recently by the Supreme Court, albeit in a different context, "[T]he thing about hypothetical lists is that they are, well, hypothetical." *Descamps v. United States*, __ U.S. __, 2013 WL 3064407, *12 (June 20, 2013). So, too, here.

Even if the Court were to credit the arguments about attributed personal earnings, Debtor's approach is insufficient. He cannot take the benefit of what he calculates to be a hypothetical income on gross real property rents without a deduction for what he has already drawn out.

Under the "commission" approach, Debtor posits an effective earnings target of $3,460.50/month (at 20%).[26] Under the "salary" approach, the average (mean) hourly wage results in a $3,916.74/month estimate. A minimum of $3,077.00 per month was already effectively "paid" Debtor, leaving arguably $383.50/month ($12,272.00 over 32 months) as unpaid "commission" or

---

[26]  In the Court's view, the evidence, such as it was, could support no more than a hypothetical 20% rate. Even Debtor's prehearing brief used 10% on the gross rentals of $546,089.00, or $54,608.90 which would be a little more than $1,700.00/month. He abandoned this rate at hearing; it obviously renders no net amount remaining unpaid after the $3,077.00/month in drawn funds. Nor would a 15% rate. Debtor argued in favor of 20% but that such a rate would be used for all Debtor's real properties, wherever located, was not established. Testimony suggested this rate would apply, if at all, only to McCall properties, and not those in Boise or Oregon. And testimony indicated that the details and terms of what the commission would and would not cover was variable and negotiable. The Court discounts the contention that a rate of 30% is appropriate. It was also limited to McCall, and the evidentiary support for it was even weaker.

MEMORANDUM OF DECISION ON EXEMPTIONS - 22

$839.74/month ($26,871.68 over 32 months) as unpaid "wage." But Debtor also has drawn funds (as yet not fully accounted for, nor reconciled) from the Schwab Account.[27] And he drew funds, not included in the stipulated $3,077.00/month amount, after the conversion to chapter 7 and without authorization, which the Court from the present record can only estimate. *See* note 15 *supra* (noting allegations of yet another $5,603.52 or more in personal expenses paid).

More fundamentally, and even if certain of these scenarios generates a "net" amount, a debtor who fails to adhere to the requirements imposed on a DIP on use of funds and selling of assets; who fails to accurately or timely report financial transactions; who does not disclose at all transactions of close to a quarter million dollars (the Schwab Account); who sells assets without Code or Court approval; who fails to immediately surrender assets and records to the trustee on conversion of the case; and who instead continues to take funds from estate accounts as a chapter 7 debtor without authority, forfeits the ability to credibly argue that the Court and creditors should attribute some hypothetically unpaid income to him.

The evidence and the record, including Debtor's conduct in the chapter 11 case, do not support the contention that he is "owed" any additional amounts that constitute "earnings" as defined under Idaho Code § 11-206 and the case law. Thus, those amounts are not exempt under § 11-207.

---

[27]  Even if, on the sketchy evidence so far, some $168,000 went into Brundage Inn from the Schwab Account, some $98,000 did not. And Debtor's proof that any of the Schwab Account funds would be attributable to personal services was utterly lacking.

MEMORANDUM OF DECISION ON EXEMPTIONS - 23

**CONCLUSION**

Trustee's objections are found to be well taken, and will be sustained.

Debtor's exemptions in the DIP accounts will be denied.  Trustee may present an

appropriate order.

DATED:  June 28, 2013

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE